Richmond

COMMONWEALTH OF VIRGINIA

v.

UNITED AIRLINES, INC.

October 6, 1978.

Record No. 761438.

Present: All the Justices.

*John G. MacConnell, Assistant Attorney General (Anthony F. Troy, Attorney General; Glenn R. Moore, Assistant Attorney General,* on brief) for plaintiff in error.

*H. Brice Graves (T.S. Ellis, III; William L.S. Rowe; Hunton & Williams,* on brief) for defendant in error.

I'ANSON, C.J., delivered the opinion of the Court.

United Airlines (United) filed an application pursuant to Code § 58-1130 (Repl. Vol. 1974) for correction of sales and use taxes assessed against it by the Department of Taxation of the Commonwealth of Virginia and for a refund of the taxes paid. United alleged that the taxes assessed on food and related items, on anti-hijacking surveillance equipment, on reservations and ticketing equipment, and on passenger and freight handling equipment at all airports it serves in Virginia are erroneous because the items were "for use or consumption by [United] directly in the rendition of its common carrier service," and are thus exempted under the provisions of Code § 58-441.6(u). It further alleged that its purchases of food and related items are also exempt as purchases for resale under the provisions of Code § 58-441.2(c); that the Commonwealth had no jurisdiction to assess sales and use taxes on United's personal property at the Washington National Airport; and that the assessments violated the commerce clause (Article 1, Section 8) of the Constitution of the United States.

The trial court heard the evidence *ore tenus* and, in a comprehensive written opinion, held that the food transferred by United to its passengers was not exempt as purchases for resale, but that all of United's personal property contested in this proceeding, including food, wherever located in Virginia, was tax exempt under the provisions of Code § 58-441.6(u) because "it was used or consumed by United directly in the rendition of its common carrier service"; that the Commonwealth lacked jurisdiction to tax United's tangible personal property at the Washington National Airport; and that, even if the Commonwealth had jurisdiction, the items were tax exempt under § 210(b) of the Airport and Airways Development Act. Accordingly, the trial court entered its order directing that the Commonwealth refund to United the sum of $536,930.71; that on assessments made before July 1, 1973, interest

shall be paid at the rate of 8% per annum from the date of this final order until refunded; and that on assessments made on and after July 1, 1973, interest shall be paid as provided by Code § 58-1140.1. Hence, the trial court did not reach the alleged violation of the commerce clause.

The pertinent evidence shows that United is a common carrier by air operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board (CAB) and that United is subject to extensive regulation by the CAB and other federal agencies. United provides passenger and freight services to airports at Norfolk, Newport News, and Richmond, Virginia, and to northern Virginia, southern Maryland, and the District of Columbia through Dulles International and Washington National Airports.

United serves meals, snacks, and beverages to its passengers and crew during flight. However, meals are served only on scheduled meal flights.

All the activities of United pertaining to food and related supplies are carried on by United's Food Services Division. The Food Services Division is organized and maintained separately from the rest of United's activities, and it operates at a considerable profit.

At Washington National Airport, which is located in Arlington County, Virginia, United's Food Services Division operates a flight kitchen which prepares passenger meals. Some of the constituent parts of a meal are flown into National from United's flight kitchens in other states. Other constituent parts are purchased by United through system-wide contracts and others are purchased locally at the Newport News and Norfolk airports. Food and other related supplies are also boarded on United's aircraft by caterers with whom United maintains long-term contracts, except at Dulles where food and other related supplies are delivered to United personnel who transport the items to the aircraft. Final preparation for serving of the food occurs on the aircraft.

Airline fare includes the cost of food and related supplies. No separate charge is made for meals and the fare does not vary for meal or non-meal flights. If the passenger refuses a scheduled

meal, he is not entitled to a refund. However, if a passenger is on a scheduled meal flight and he does not receive a meal, he can receive a refund voucher entitling him to a replacement meal in kind or a credit towards a replacement meal at specified airport locations.

United utilizes a highly sophisticated national communications network known as "Apollo." The center of the system is located in Denver, Colorado. The computerized system has a terminal service in all the airports served by United in Virginia and its reservations center located in McLean, Virginia. The terminals and units which make up the system are used for reservations and ticketing purposes and to provide flight information to United's crews. There was testimony that "when Apollo ceases to function, it stops the whole show."

United maintains anti-hijacking surveillance equipment, which is required by federal regulations, at each airport it serves in Virginia.

For the period in question, the Department of Taxation assessed United for sales taxes on the following categories of items here in dispute: (1) food and related items; (2) anti-hijacking surveillance devices; (3) reservation and ticketing equipment; and (4) passenger and baggage service equipment.

The issues presented are: (1) whether the items of tangible personal property which United claimed to be exempt from the payment of sales and use taxes were purchased and used by United directly in the rendition of its common carrier service; (2) whether the trial court erred in not holding that United's purchases of food and related items served its passengers were exempt from sales and use taxes, as contended by United on its cross-appeal, on the ground that the purchases were made for resale; (3) whether the Commonwealth lacked jurisdiction to assess sales taxes on United's tangible personal property at Washington National Airport; and (4) whether interest runs on refunds of erroneously assessed taxes from the date of judgment where the assessment occurred prior to July 1, 1973.

■ Code § 58-441.6(u) exempts "[t]angible personal property sold or leased to an airline . . . for use or consumption by such

airline *directly in the rendition of its common carrier service.*" (Emphasis supplied). This subsection has not been previously considered by us. But the section, insofar as it is pertinent here, parallels § 58-441.6(h), which exempts "tangible personal property sold or leased to a public service corporation engaged in business as a common carrier of property or passengers by motor vehicle, for use or consumption by such common carrier *directly in the rendition of its public service.*" (Emphasis supplied).

In *Commonwealth v. Community* Motor Bus, 214 Va. 155, 198 S.E.2d 619 (1973), we considered the scope of the exemption under the provisions of Code § 58-441.6(h). There we held that statutes granting tax exemptions are construed strictly against the taxpayer and that the word "directly" in Code § 58-441.6(h) narrowed the scope of the exemption to include only such essential tangible personal property used immediately and principally by a common carrier to keep its motor vehicles on the streets and highways in the actual transportation of passengers. We also said the "direct use" exemption excluded items merely convenient and facilitative to the business and items which are essential to the operation of the business as a whole but not an immediate part of actual performance of the public service.

In addition to the principles set out in *Community Motor Bus*, certain other principles are firmly established in Virginia. A tax assessment made by proper authorities is *prima facie* correct and the burden is on the taxpayer to show that such assessment is erroneous. *Commonwealth v. Radiator Corp.*, 202 Va. 13, 18, 116 S.E.2d 44, 47 (1960). Exemptions granted under the sales and use tax statutes are construed strictly against the taxpayer, with doubts resolved against the exemption. *Webster v. Department of Taxation*, 219 Va. 81, 245 S.E.2d 252 (1978); *Winchester TV Cable v. State Tax Commissioner*, 216 Va. 286, 289-90, 217 S.E.2d 885, 889 (1975); *Golden Skillet Corp. v. Commonwealth*, 214 Va. 276, 278, 199 S.E.2d 511, 513 (1973). The construction of a statute by a state official charged with its administration is entitled to great weight, but we, of course, are not bound by such construction if inconsis-

tent with the applicable statutes.[1] *Webster Brick*, 219 Va. at 84-85, 245 S.E.2d at 255; *Winchester TV*, 216 Va. at 290, 217 S.E.2d at 889; *Dept. Taxation v. Prog. Com. Club*, 215 Va. 732, 739, 213 S.E.2d 759, 763 (1975).

Guided by the above principles, we will consider whether United was erroneously assessed sales and use taxes on the items classified under the four categories.

## I.  Food and Related Items

The Commonwealth argues that meals served by United to passengers during flights of its aircraft are not exempt under the provisions of Code § 58-441.6(u) because the food and related items were "not used or consumed by United *directly* in rendition of its common carrier service;" that the Department of Taxation's Rules and Regulations specifically state that food delivered to aircraft in this State is not exempt from sales and use taxes; and that the transfer of the food to United's passengers was not a resale exempted under Code § 58-441.2(c).

On the other hand, United argues that food is exempt from taxation either because it is used directly in the rendition of its common carrier service or because the furnishing of meals to its passengers is a resale for a consideration; that the Rules and Regulations of the Tax Department are not entitled to any weight because they have been inconsistently applied by the Department;[2] and that the tax on food is a burden on interstate commerce in violation of the Federal Consitution.

We do not agree with the trial court's holding that food was used by United directly in the rendition of its common carrier service and that United was exempt from the payment of sales and use taxes on food and its related items served to in-flight passengers.

---

[1] The Department of Taxation is authorized by Code § 58-441.41 to make and publish "reasonable rules and regulations" for assessment of sales and use taxes not inconsistent with the applicable statutes.

[2] United cites the Department's refusal to exempt food while exempting motor vehicles used to load food on aircraft and carts used to serve food to customers.

Section 1-7 of the Sales and Use Tax Rules and Regulations provides:

> "Tangible personal property sold or leased to an airline operating in interstate or foreign commerce under a certificate of convenience and necessity issued by the Federal Civil Aeronautics Board or successor agency, for use or consumption by such airline *directly* in the *rendition of its common carrier service, is not* subject to the tax. The furnishing of meals by such an airline to passengers or others is not use or consumption of tangible personal property by the airline *directly in the rendition of its common carrier service.* Further as to meals, see § 1-64." (Emphasis in the original).

Section 1-64 of the Regulations, in pertinent part, provides:

> "The tax applies to the sale of meals or other tangible personal property by railroad, Pullman Car, steamship, airline, or other transportation companies operating in the State of Virginia. The tax applies ▊ ▊eals delivered to carriers in this State to be furnished without a specific charge therefor to passengers regardless of where served."

The record shows that food and related items are not served on all United flights. Meals are served to passengers only when the time of those flights occurs around regular meal hours. The same fare is charged on flights between the same points even when food is not served. Under those circumstances, the service of food is considered a commercial amenity and an operating expense which is necessary in the competitive field of transportation by air. Thus, food and related items cannot be considered essential tangible personal property "used immediately and principally" by United to transport passengers by air in its role as a common carrier.

We do not believe that sections 1-7 and 1-64 of the Department's Rules and Regulations are inconsistent with the provisions of § 58-441.6(u). Neither do we believe that the Department's refusal to exempt food, while exempting the motor vehicles used to load food

on aircraft and carts used to serve the food to passengers (see note 2), creates such an inconsistency that we should accord the Rules and Regulations no weight.

We agree with the trial court's holding, however, that "the delivery by United of meals to its passengers was not a 'resale' in contemplation of Code § 58-441.2(c)."

Code § 58-441.2(c), in pertinent part, defines "Retail sale" or a "sale at retail" to mean

> "a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property or services taxable under this chapter, . . . provided, that sales for resale must be made in strict compliance with rules and regulations made under this chapter."

In *American Airlines, Inc., et al.* v. *The Department of Revenue*, 58 Ill.2d 251, 319 N.E.2d 28 (1974), relied upon by the trial court, the Supreme Court of Illinois was presented with the identical issue and essentially the same facts as in the case at bar. There the court held that where a vendor sold food to the airline for service to its passengers on airline flights, the sale was a "sale at retail" for use and consumption by the airline; that the service of meals was not a resale to passengers within the statute because meals were not separately considered and charged for, but were treated as a commercial amenity and operating expense, necessary in the competitive field of air transportation; that there was no bargain as to the meal American would serve the passenger and the charge he would pay; that consideration within the meaning of the definition of sale at retail is consideration which was bargained for; and that American did not acquire the food from the vendor for resale to its passengers for a valuable consideration. The court also noted that American was essentially selling transportation by air, and that is what its passengers were purchasing.

*Undercofler* v. *Eastern Airlines, Inc.*, 221 Ga. 824, 147 S.E.2d 436 (1966); *United Air Lines, Inc.* v. *Department of Treasury*, (Cir. Ct. of Ingham County, Mich. No. 13967-C) *leave to appeal denied*, 389 Mich. 781 (1973); *State* v. *Hertz Skycenter, Inc.*, 55 Ala. App. 481, 317 So.2d 319 (1975); and *State* v. *Delta Air Lines, Inc.*, Ala. Civ.

App., 356 So.2d 1205, *cert. denied,* 356 So.2d 1208 (1978) were relied upon by United. We do not find those cases persuasive.

We hold that the service of food and related items by United to its passengers was not a resale in contemplation of Code § 58-441.2(c) and that United was not exempt from the payment of the taxes on that ground.

There is no merit in United's argument that the sales tax assessed against it for the food purchased was prohibited as a burden on interstate commerce. Here United purchased and took delivery of the items in Virginia and the transaction was not in interstate commerce, even though the items were immediately taken out of Virginia for use outside the Commonwealth. "The mere purchase of supplies or equipment for use in conducting a business which constitutes interstate commerce is not so identified with that commerce as to make the sale immune from a nondiscriminatory tax imposed by the State upon intrastate dealers. . . . A nondiscriminatory tax upon local sales in such cases has never been regarded as imposing a direct burden upon interstate commerce . . . ." *Eastern Air Transport, Inc. v. South Carolina Tax. Comm.,* 285 U.S. 147, 153 (1932). *See American Airlines, supra,* 58 Ill.2d at 260, 319 N.E.2d at 33. *See also United Air Lines, Inc. v. Mahin,* 410 U.S. 623, 627-30 (1973).

II. *Anti-Hijacking Surveillance Equipment*

This equipment is required by federal law in an attempt to cope with the catastrophic acts of aircraft piracy or "hijacking." But, the fact that anti-hijacking surveillance equipment is required under federal law does not in and of itself render the equipment subject to exempt status under § 58-441.6(u). *See Community Bus, supra,* 214 Va. at 159, 198 S.E.2d at 621; *Fyr-Fyter Co. v. Glander,* 150 Ohio St. 118, 124, 80 N.E.2d 776, 779 (1948).

However, a common carrier of passengers for hire by air is under a duty to exercise the highest degree of care for the safety of its passengers compatible with the normal prosecution of its business. *See* Annot., 73 A.L.R.2d 346, § 4(a) at 358-69 (1960), and the great number of cases there collected. This is, of course, the ordinary rule as to common carriers generally. *See Norfolk W. R. Co. v. Tanner,* 100 Va. 379, 382, 41 S.E. 721, 722 (1902); 3B Mich. Jur., *Carriers,* § 49 at 82-85 (1976).

Hijackers present a serious threat to the safety of commercial airline passengers and aircraft. Anti-hijacking equipment is deployed to prevent hijackers from boarding aircraft and to safeguard passengers and the aircraft itself. Culpability of a commercial airline carrier may occur because of its failure to take recognized steps to safeguard its passengers against air piracy. Hence, we hold that anti-hijacking equipment is used directly in United's rendition of its common carrier service, and it is exempt from taxation under the provisions of Code § 58-441.6(u).

### III.  Reservation and Ticketing Equipment

■ United's highly sophisticated electronic system, known under the trade name as "Apollo," collects, processes, and computerizes information which is critical to the operational efficiency and safety of its aircraft, and disseminates it through terminals located in each airport from which United operates. The information so disseminated provides the crew of each of its aircraft with weather data, flight plans, cruising altitude, fuel limitations, weight limits, safety speeds, and other data. The system also furnishes information for reservations and ticketing data and prints passenger tickets automatically.

The Department concedes, as it must, that some of the data furnished by the "Apollo" system is critical to and used directly in rendering common carrier service. But it argues that the reservation and ticketing function performed by "Apollo" is not "used directly in keeping United's planes in the air" and, therefore, the equipment should be separated for tax purposes. We do not agree.

Here we are dealing with an integrated information system which is critical and essential to the effective rendition of United's common carrier service. Thus, all the functions performed by "Apollo" are used directly in the rendition of United's common carrier service and, therefore, the reservations and ticketing equipment, which is an integral part of the "Apollo" system, is exempt from taxation under Code § 58-441.6(u).

### IV.  Passenger and Baggage Service Equipment

■ This category includes equipment necessary to the loading, unloading and handling of passenger baggage, supplying the

packing boxes for freight, an intercom system, attendant stands at passenger gates, baggage and ticket computer components, flight information boards, and parking wands. Although a disposal unit and an eating utensil packing machine used at United's flight kitchen in Washington National Airport are included under the above category, we will deal with them under the Washington National Airport jurisdictional issue.

Transporting and handling passenger baggage is an integral part of an airline's common carrier service. The equipment necessary for loading or unloading and the handling of baggage is used directly by United in the rendition of its common carrier service. Packing materials and gate assemblies are indispensable in the safeloading of aircraft and transportation of baggage and freight. Ticket and baggage counter components, the intercom system, flight information boards and attendant stands at passenger gates are used to process the passengers and send them on their flight.[3] Headrest covers are used to provide sanitary protection for passenger seats on the aircraft. Parking wands are used to accomplish the safe movement of aircraft while on the ground. All of these items are used directly in the rendition of common carrier service and are thus exempt from taxation under Code § 58-441.6(u).

### Washington National Airport Jurisdictional Issue

By a State-Federal compact entered into in 1946, Virginia ceded to the United States exclusive jurisdiction over the territory embraced within the Washington National Airport, reserving only the specific tax powers relating to the sale of oil, gasoline, and all other motor fuels and lubricants sold at the airport for use in over-the-road vehicles. Hence, Virginia and Arlington County were precluded by this compact from asserting any other tax powers at Washington National Airport. *See Floyd* v. *Fischer,* 199 Va. 363, 99 S.E.2d 612 (1957).

Prior to the date of the State-Federal compact, Congress, in 1940, had enacted the "Buck Act" (4 U.S.C., §§ 105-10), which

---

[3] Railroad companies are required by statute to perform some of the above functions. See Code § § 56-376 and 56-378.

provided, in effect, that the states and their political subdivisions might impose income, *sales and use taxes* within federal enclaves situated in the several states. But, because of the State-Federal compact, Washington National Airport was the only civil airport in the United States where businesses were immune from state and local taxation.

In 1968, the General Assembly of Virginia adopted legislation to amend the compact by extending its jurisdiction to levy taxes under the provisions of the "Buck Act" and to revoke the section of the compact ceding its taxing powers at Washington National. The legislation also sought the right to impose and collect enplaning service fees as provided in Chapter 7, Title 5.1 of the Code of Virginia of 1950, as amended, (Repl. Vol. 1978). However, it was provided that the legislation would not become effective unless and until the rights were ratified and accepted by the Congress of the United States. Acts 1968 at 1369, 1371-72.

As a result of Virginia's 1968 Act, legislation was immediately proposed in Congress to grant the Commonwealth the right to impose and levy taxes on activities at the National Airport as provided under the "Buck Act," but this legislation failed passage. Later, when the Airport and Airways Development Act (AADA) was under consideration in Congress, Representative Joel T. Broyhill of Virginia proposed an amendment to the AADA which was enacted as § 210 of the Act, effective July 1, 1970.

Section 210 provides, in pertinent part, as follows:

"(a)   Nothing in this title or in any other law of the United States shall prevent the application of . . . [the Buck Act] to civil airports owned by the United States.

"(b)   Subsection (a) shall not apply to—

(1)   sales or use taxes in respect of fuels for aircraft or in respect of other servicing of aircraft, or

(2)   taxes, fees, head charges, or other charges in respect of the landing or taking off of aircraft or aircraft passengers or freight."

It is obvious that the language of § 210(a) embraced the act by which Congress entered into the State-Federal compact of 1946 (Act of October 31, 1945, Public Law 208, Statutes at Large). The

only limitations on the scope of subsection (a) were that sales and use taxes could not be imposed "in respect of fuels for aircraft or in respect of other servicing of aircraft," and that taxes, fees or other charges could not be imposed on "the landing or taking off of aircraft or aircraft passengers or freight."

The Commonwealth contends that because the meaning of the phrase "other servicing of aircraft" is to be interpreted to mean items similar to "fuels for aircraft," those items assessed and taxes levied on United's personal property at Washington National Airport after July 1, 1970, do not fall within the exemption category, and that § 210 of the AADA allows the Commonwealth to exercise its taxing authority under the "Buck Act" to the fullest, except as otherwise provided.

On the other hand, United contends that its personal property at Washington National Airport fell within the category of "other servicing of aircraft" and is not limited to items similar to "fuel"; that while the phrase "in respect of other servicing of aircraft" is not clear, it shows a congressional purpose to continue in effect the tax-free status of the airline industry at Washington National Airport; and that the legislative history of the AADA supports this contention.

■ Federal statutes allowing exemptions from taxation, like state exemption statutes, are to be narrowly construed. *Bingler v. Johnson,* 394 U.S. 741, 751-52 (1969).

■ The meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases. Thus, when general words and specific words are grouped together, the general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words. *Prog. Com. Club, supra,* 215 Va. at 737-38, 213 S.E.2d at 762-63 (1975); *Kohlberg v. Va. Real Estate Comm.,* 212 Va. 237, 183 S.E.2d 170 (1971); *Sellers v. Bles,* 198 Va. 49, 92 S.E.2d 486 (1956); *Sands,* 2A *Sutherland Statutory Construction* (4th ed. 1973), § 47.17.

■ The words used in section 210(b)(1) are "fuels for aircraft" or "other servicing of aircraft." Both phrases refer to aircraft. Thus, the first limitation imposed on the exemption by the words used is that the exempt items must be used in other servicing of

aircraft. It is clear that the word "fuels" denotes one specific type of servicing of an aircraft but not the only type. Hence, the construction of the phrase "other servicing of aircraft" results in a limitation of the exemption to items similar to fuels that service the aircraft itself, such as lubricants, etc. The exception relates to servicing of aircraft, not servicing passengers or freight.

Section 210(b)(2) was a rejection of one of Virginia's requests made in its 1968 Act that it be specifically permitted to impose an enplaning fee on passengers deploying from Washington National. Even so, the sales and use taxes imposed upon United in this case do not constitute the type of "head" and other charges contemplated by § 210(b)(2).

United relies on excerpts from the legislative history of the AADA in support of its contention that all its personal property at National is exempt as servicing of aircraft passengers and freight.

The language used in the report of the congressional committee is as follows:

> "It appears inconsistent to continue complete exemption from State sales and income tax jurisdiction when other competitive businesses located in the vicinity are subject to these State taxes. It was concluded that the general rules as to tax jurisdiction on Federal reservations are also to apply, with certain exceptions, to Washington National Airport. Exceptions are provided with respect to taxes on aviation fuels, servicing of aircraft, landing or takeoff fees, and other charges dealing with aircraft, passengers, and freight. Facilities which serve persons not as passengers, however, are subject to the general State tax jurisdiction.
>  . . . .
>
> "Accordingly, this title provides that with certain exceptions, the general rules as to taxes on Federal reservations are to apply in the case of Washington National Airport. Exceptions are provided with regard to fuels and

servicing of aircraft and landing and takeoff charges. However, facilities at the airport that do not deal directly with the passengers or with the aircraft would come under the general provisions of law. So, for example, facilities for the preparation of food to be served when the aircraft is airborne will be exempt, while restaurant and cafeteria facilities for the general public, employees, and others on the ground will be subject to the provisions of general law." H. Rep. 91-601 at 51, 91st Cong. 2d Sess. reprinted in (1970) U. S. Code Cong. & Ad. News 3047 at 3086, 3096.

The report of the congressional committee does not classify food and related items as "other servicing of aircraft," nor does it mention that food and related items served when the aircraft is airborne will be exempt from sales taxes. The report does state, however, that "facilities for the preparation of food to be served when the aircraft is airborne will be exempt."

We note that the legislative history of a statute is an appropriate source to consult for the purpose of ascertaining the intent of Congress. But in the construction of a statute, courts are not required to follow committee reports which import a broader meaning than the statutory language. *Railroad Com. v. Chicago, B. & Q. R. Co.*, 257 U.S. 563, 588-89 (1921).

While the congressional committee's report stated that the facilities at Washington Airport used in the preparation of food served to passengers when the aircraft is airborne will be exempt, this statement is broader than the language of the provisions of § 210 of the AADA and we are not required to give it effect. We hold that such facilities are not exempt under the language of § 210 of the AADA and are not used directly by United in the rendition of its common carrier service under the provisions of Code § 58-441.6(u). Hence, the assessments on the facilities used for the preparation of food were not erroneous.

Additionally, when the language of § 210 of the AADA is considered as a whole, it is clear to us that Congress granted Virginia all the "Buck Act" powers to assess and levy sales and use

taxes on the personal property of United and other airlines operating out of Washington National Airport, except as to fuels, lubricants, and analogous items used in servicing the aircraft itself. If this were not its intent, Congress could have very easily provided that § 210 of the AADA was not to apply to any aspect of the airline industry operating out of the airport.

We hold that the Virginia Department of Taxation had jurisdiction under the provisions of § 210 of the AADA to assess sales and use taxes on food and related items boarded on United's aircraft at Washington National and served to its passengers when the aircraft was airborne, and that United is not exempt from sales and use taxes because food and related items are not used directly by United in the rendition of its common carrier service (Code § 58-441.6(u)).

The anti-hijacking equipment, reservation and ticketing equipment, and passenger and baggage service equipment used at Washington National Airport are exempt from sales and use taxes under the provisions of Code § 58-441.6(u).

We agree with the trial court that on erroneous assessments made before July 1, 1973, interest shall be paid at the rate of 8% per annum on the amounts paid by United from the date of the final judgment until refunded (Code § 8.01-382); and that on the erroneous assessments made on and after July 1, 1973, interest shall be paid on the amounts paid by United as provided by Code § 58-1140.1.

For the reasons stated, the case is remanded for further proceedings not inconsistent with this opinion.

*Affirmed in part,*
*Reversed in part*
*and remanded.*

COCHRAN, J., concurring in part, dissenting in part.

I agree with the majority that United is not entitled to exemption from payment of sales and use taxes for food and related items served to passengers. The exemption provided by Code § 58-441.6(u) for tangible personal property sold or leased to an airline "for use or consumption by such airline directly in the rendition of

its common carrier service" is not applicable. Food and related items are not used directly in the rendition of United's common carrier service. Nor is the purchase of such items by United for service to its passengers a "sale at retail" for resale that would be exempt under the provisions of Code § 58-441.2(c). And I find no merit in United's contention that the tax would impose a direct burden upon interstate commerce. Therefore, I concur with the majority in holding that the trial court erred in ruling that food and related items were entitled to exemption.

I cannot agree with the majority that all the other tangible personal property in controversy is exempt because it is used directly in the rendition of United's common carrier service. Such a holding cannot, in my view, be reconciled with the principles recently approved by us in *Commonwealth* v. *Community Motor Bus*, 214 Va. 155, 198 S.E.2d 619 (1973), and reaffirmed in *Webster* v. *Department of Taxation*, 219 Va. 81, 245 S.E.2d 252 (1978).

The majority opinion correctly points out that the language of the exemption provided in Code § 58-441.6(u) for airlines parallels the language of Code § 58-441.6(h) which sets forth the exemption of tangible personal property sold or leased to a motor vehicle common carrier for use or consumption "directly in the rendition of its public service". We narrowly construed the word "directly" in the exemption provision of Code § 58-441.6(h) in *Community Motor Bus* to include "only such essential tangible personal property used immediately and principally by a common carrier to keep its motor vehicles on the road in performance of its public service". *Id.* at 159, 198 S.E.2d at 622. We also held that items which are essential to operation of a business but are not an immediate part of public-utility service are not exempt and that exemption is not provided merely because the taxpayer is re-quired by law to comply with certain conditions.

In *Webster Brick*, we noted that since adoption of the 1971 Constitution we have applied the mandate of strict construction against taxpayers in all cases where exemptions were sought under Code § 58-441.6; we resolve any doubt against one claiming the exemption; and we accord great weight to the construction placed upon the statute by a state official charged with its administration.

While the majority opinion does not disavow these guidelines and, indeed, restates them with approval, its effect is to establish a new and broader definition of "direct use" applicable only to common carriers by air. For example, in approving the exemption of anti-hijacking surveillance equipment, the majority recognizes that this equipment is not *per se* exempt merely because it is required by federal law. However, the majority goes on to hold that the "direct use" exemption applies to this equipment because of the potential culpability of an air carrier for failure to provide adequate protection against air piracy. This would seem to extend the definition of "direct use" far beyond that contemplated by *Community Bus*.

The exemption of the highly sophisticated electronic computer system known as "Apollo" was also based upon its direct use in the furnishing of air carrier service. That some of the data furnished by the Apollo system, such as weather information, flight plans, fuel limitations, cruising altitudes, and weight limits, are used directly in providing common carrier service is not denied by the Department of Taxation. But, insofar as the Apollo system comprises reservation and ticketing equipment, the Department contends, and I agree, that the exemption should not apply. As to this category I would remand the case for a determination of the property not entitled to exemption.

By the same reasoning I cannot agree that aircraft passenger and baggage servicing equipment, while useful and even essential in maintaining an airline's competitive marketing position, is used directly in the rendering of common carrier service by air under the guidelines heretofore approved by us.

Although it is a very close question, I concur in the majority view that under § 210 of the Airport and Airways Development Act, effective July 1, 1970, the Department of Taxation has jurisdiction to impose sales and use taxes on United's tangible personal property at Washington National Airport, except for fuels for aircraft and items similar to fuels used in servicing aircraft.