## Richmond

## WEBSTER BRICK COMPANY, INC. v.
## DEPARTMENT OF TAXATION,
## COMMONWEALTH OF VIRGINIA

June 9, 1978

Record No. 770280

Present: I'Anson, C.J., Carrico, Cochran, Harman, Poff and Compton, J.J.

*Charles D. Fox (Hunter, Fox & Wooten,* on brief) for plaintiff in error.

*Norman K. Marshall, Assistant Attorney General (Anthony F. Troy, Attorney General; Glenn R. Moore, Assistant Attorney General,* on brief) for defendant in error.

*Amicus Curiae:* Tri-County Independent Coal Operators Association, Inc. *(Waller H. Horsley; R. Kenneth Wheeler; William L.S. Rowe; Hunton & Williams,* on brief) for plaintiff in error.

COCHRAN, J., delivered the opinion of the Court.

After an audit the Department of Taxation of the Commonwealth assessed and demanded from the taxpayer, Webster Brick Company, Inc., the sum of $13,255.14 for certain delinquent sales

and use taxes, with penalty and interest, allegedly payable to the Commonwealth. Webster paid this amount under protest and timely filed its application in the court below under the provisions of Code § 58-1130 for correction of an erroneous assessment and for refund of $7,345.47 alleged to have been erroneously assessed and paid.

The trial court heard evidence *ore tenus* and on November 5, 1976, in accordance with its written opinion filed on the same date, entered a final order dismissing the taxpayer's application with prejudice and awarding judgment in favor of the Department of Taxation. Webster, appealing this order, contends that the trial court erred in denying the taxpayer exemption from the Sales and Use Tax Act for items enumerated in its application for relief.[1]

Webster is a corporation engaged in the manufacture and sale of brick. It sought exemption under the provisions of Code § 58-441.6[2] from payment of sales taxes on purchases of the following tangible personal property:

(1)   Dunnage bags;

(2)   Cement, reinforcing steel, rods, and wires;

(3)   Oil tanks and foundations;

(4)   Ventilators;

(5)   Crane and hoist;

(6)   Chemicals used in a boiler.

The *amicus curiae*, Tri-County, opposes the denial by the trial court of exemptions only as to items (2), (3), and (4).

The only witness at trial was Wiley Kling, Treasurer of Webster, who described the location and use of the items in controversy,

---

[1] Tri-County Independent Coal Operators Association, Inc., with leave of court, filed a brief *amicus curiae* challenging the denial of exemption as to certain of the items set forth in Webster's application.

[2] "§ 58-441.6: *Exclusions and exemptions.* — The terms 'sale at retail,' 'lease or rental,' 'distribution,' 'use,' 'storage' and 'consumption' shall not include industrial materials for future processing, manufacturing, refining, or conversion into articles of tangible personal property for resale where such industrial materials either enter into the production of or become a component part of the finished product; . . . nor shall such terms include machinery or tools or repair parts therefor or replacements thereof, fuel, power, energy or supplies, used directly in processing, manufacturing, refining, mining or conversion of products for sale or resale; nor shall such terms include materials, containers, labels, sacks, cans, boxes, drums or bags for future use for packaging tangible personal property for shipment or sale."

and identified a dunnage bag that was introduced into evidence as an exhibit. Such a bag, made of paper and plastic, was used by Webster in each railway car in which stacks of brick, known as "cubes", were loaded for shipment. The bag, when placed between cubes and inflated, compresses the brick and holds the cubes in place without movement inside the car in transit. Inflated, a dunnage bag may wrap around two sides of a cube; uninflated, a dunnage bag does not prevent the shifting of brick in any direction.

The cement, reinforcing steel, rods, and wires were used in construction of the permanent concrete floor and kiln tunnel in one of the Webster manufacturing plants. An automatic haulage system was installed in the floor to move the brick on tracks across the plant.

In three fuel oil tanks, permanently mounted outside the plant on concrete foundations, oil was stored for use in the manufacturing process. The fuel lines were buried underground between the tanks and the plant.

Five "up-blast" ventilators in the roof of the plant controlled the exhaust gasses within the building, as well as the heat and occasionally the humidity.

The crane and hoist unit was used exclusively to service and maintain equipment that makes the brick. The sludge-retarding chemicals were used only in the boiler to keep it in good operating condition.

Since adoption of the 1971 Constitution,[3] we have applied the mandate of strict construction against the taxpayers in all cases where exemptions were sought under Code § 58-441.6; and we resolve any doubt against the one claiming exemption. *Winchester TV Cable* v. *State Tax Commissioner*, 216 Va. 286, 289-90, 217 S.E. 2d 885, 889 (1975); *Department of Taxation* v. *Progressive Community Club*, 215 Va. 732, 735-36, 213 S.E.2d 759, 761-62 (1975). We have repeatedly held also that the construction of a statute by a state official charged with its administration is entitled to great

---

[3] Article X, Section 6(f) provides:

"Exemptions of property from taxation as established or authorized hereby shall be strictly construed; . . . ."

weight.[4] 216 Va. at 290, 217 S.E.2d at 889; 215 Va. at 739, 213 S.E.2d at 763. With these principles guiding us, we consider the exemptions sought by Webster.

### 1. Dunnage bags.

Webster argues that the dunnage bags are used as "materials" in packaging tangible personal property for shipment and are, therefore, exempt under the express language of Code § 58-441.6, as explicated by the Department's Rules and Regulations.[5] The Department contends, however, that the packaging exemption is limited to containers and that material used in packaging, to be exempt, must be used in connection with placing manufactured articles in containers.

The trial court, relying upon the difference between the definitions of "packing" and "packaging", held that the dunnage bags were used to "pack" cubes of brick in cars rather than to "package" the bricks in containers, and that the packaging exemption was inapplicable. We agree.

"Packaging" means putting into a protective wrapper or container for shipment or storage. *Webster's Third New International Dictionary*, 1618 (1969). The cubes of brick are not placed in the dunnage bags, so the bags are not exempt as containers. The cubes are placed in freight cars, which are expressly eliminated, as containers, from the packaging exemption by Sales and Use Tax

---

[4] Such construction, of course, is not binding upon us. The Department of Taxation, authorized by Code § 58-441.41 to make and publish "reasonable rules and regulations" not inconsistent with the applicable statutes, has issued Virginia Retail Sales and Use Tax Rules and Regulations, revised July 1, 1969. In the present case, the reasonableness of only the provision of Section 1-63 of the Rules and Regulations denying exemption to "materials to be incorporated into real estate construction" (infra n. 7) is challenged, and this provision is irrelevant to our decision.

[5] Section 1-63 of the Rules and Regulations merely follows the exemption language of the last clause of Code § 58-441.6 as to "[m]aterials ... for packaging tangible personal property for shipment or sale (whether returnable or non-returnable) . . . ."

Sales and Use Tax Circular No. 9, published September 23, 1974, provides in pertinent part:

"1. . . . In order to qualify for the packaging exemption [provided by Code § 58-441.6] containers . . . must restrain movement of the product in more than a single plane of direction."

" . . . .

"2. Tangible personal property such as truck bodies and trailers, tank cars and freight cars, ships and vessels, containerized cargo, and any items of a similar nature are not eligible for the packaging exemption."

Circular No. 9. Webster contends that the bags qualify for exemption, however, as materials for future use for packaging the cubes of brick. But the cubes are not packaged; they are not put into a protective wrapper or container for shipment. The dunnage bags touch the cubes but are not attached to them; the bags, when inflated, merely compress the cubes, and fix them in place, thus packing the brick securely in the freight cars.

In *Custom Beverage Packers, Inc. v. Kosydar,* 33 Ohio St. 2d 68, 294 N.E.2d 672 (1973), the packaging exemption of the Ohio sales and use tax statute was considered. The exemption applied to "packages" and "material" for use in "packaging" tangible personal property. "Packages" were defined to include various enumerated kinds of containers, such as bags, boxes, and cans, and "packaging" was defined as placing tangible personal property in the packages. The Ohio court observed that each of the items included in the examples of packages restrained movement of the packaged object in more than one plane of direction. The court held that unbound pallets, upon which cases of bottles were transported, restrained movement in only one direction and were not packages within the meaning of the exemption.

Sales and Use Tax Circular No. 9 provides that, to qualify for the packaging exemption, *containers* must restrain movement of the product in more than one plane of direction. However, this requirement, applicable only to containers, is irrelevant as to the dunnage bags, whose exemption depends upon whether they are materials to be used for packaging. Although "packaging" has not been defined in the Virginia statute, we believe that it is reasonable to infer a legislative intent that the word, as used in Code § 58-441.6, means placing in a package or container. Under this definition, we hold that the exemption is not applicable to the dunnage bags.

### 2. The other items.

■ The dispositive question as to all the other items for which Webster seeks exemption is whether they were used directly in manufacturing within the meaning of Code § 58-441.3(q).[6] Section

---

[6] "'Used directly', when used in relation to manufacturing . . . refers to those activities which are an integral part of the production of a product, including all steps of an integrated manufacturing process, but not including ancillary activities such as storage or transportation before or after actual production, general maintenance or administration."

1-63[7] of the Department's Rules and Regulations gave a more detailed explanation of the statutory provision, and the trial court determined that all the items were excluded from exemption thereunder because they were not used directly in manufacturing, and all the items except the chemicals and the crane and hoist were incorporated into the real estate.

Webster and the *amicus* argue that the court erred in relying upon the rationale of incorporation into the real estate. Webster maintains that its entire manufacturing facility is a machine, and that all the contested items were "used directly" in manufacturing. We construe the trial court's ruling based on incorporation of the items into the real estate to be an alternative ruling, as to which we express no opinion. The primary ruling of the court was that the items were not used directly in manufacturing. We reject the taxpayer's contention that the entire manufacturing plant, including the outside oil storage tanks, constituted a machine entitled to a blanket exemption. We acknowledge, and the Department concedes, that each item was essential to the operation of the business of manufacturing and selling brick. But essential items which are not an immediate part of actual production are not exempt. *See Commonwealth* v. *Community Motor Bus,* 214 Va. 155, 158, 198 S.E.2d 619, 621 (1973).

Under the provisions of Code § 58-441.3(q) and Section 1-63 of the Rules and Regulations, denying exemption to general maintenance activities and to machinery and tools used to repair and maintain production machinery, the chemicals used in the maintenance of the boiler, and the crane and hoist unit used to maintain and repair machinery were correctly held by the trial court to be taxable. In *Standard Oil Co.* v. *Peck,* 163 Ohio St. 63, 125 N.E.2d 342

---

[7] "The tax does not apply to:

\* \* \*

"(d) Machinery . . . or supplies, used directly in manufacturing . . . products for sale or resale;

\* \* \*

" . . . The exemption does not apply to materials to be incorporated into real estate construction."

\* \* \*

" . . . [T]he expenditures concerned with general maintenance, heating and illumination . . . are taxable since these functions are only indirectly involved in production. Likewise, machinery and tools used to repair and maintain machinery and tools used directly in production are taxable."

(1955), it was held that a crane used only in the maintenance of pipelines and valves at the taxpayers's oil refinery was not exempt under the Ohio statute exempting such property used "directly in the production of tangible personal property for sale by . . . processing, refining." *See also Dain Mfg. Co.* v. *Iowa State Tax Commission,* 237 Iowa 531, 538, 22 N.W.2d 786, 790-91 (1946); *Cheney* v. *Georgia-Pacific Paper Corporation,* 237 Ark. 161, 168-169, 371 S.W.2d 843, 848 (1963). Indeed, in oral argument, counsel for Webster conceded that exemption of the chemicals was foreclosed by the regulation, and that exemption of the crane and hoist was at least questionable.

█ The ventilators, installed in the roof of the plant, perform an essential function in providing climate control. It is conceded by the Department of Taxation that if the ventilators had been used directly in manufacturing, they would have been exempt notwithstanding their attachment to the real estate. But the trial court found that the ventilators were not used directly in manufacturing.

Section 1-63 of the Rules and Regulations, denying exemption to expenditures for general maintenance, heating and illumination, supports this finding, as do cases from other jurisdictions. Thus, in *Blackmon* v. *Screven County Industrial Dev. Auth.,* 131 Ga. App. 265, 205 S.E.2d 497 (1974), exemption was denied a taxpayer for climate control equipment, modifying temperature and humidity in a synthetic yarn manufacturing plant, as not being "used directly" in manufacturing. Environmental control equipment essential to the manufacturing of color television tubes was held not to be exempt under the Indiana statute exempting equipment "directly used" in the "direct production" of tangible personal property. *Indiana Dept. of St. Rev., Sales Tax Div.* v. *RCA Corp.,* 160 Ind. App. 55, 310 N.E.2d 96 (1974). Accordingly, we hold that the trial court did not err in denying exemption for the ventilators.

█ The oil storage tanks and their foundations were also affixed to the real estate, but this fact, as the Department concedes, is not determinative of the question of their taxability. If they were used directly in manufacturing they were entitled to exemption. Again, the trial court ruled that they were not used directly in manufacturing. Webster's contention that the tanks were part of the plant machinery is untenable. The tanks are not machines, with moving parts, on the production line. They store oil which is used directly in the manufacturing processs, but they themselves are not so used.

In Ohio, oil storage tanks have been held subject to the sales and use tax because they were not used "directly in the production of tangible personal property", as required for exemption under the statute. *Standard Oil Co.* v. *Peck, supra.* To the same effect is *Hawes* v. *Custom Canners, Inc.,* 121 Ga. App. 203, 173 S.E.2d 400 (1970), holding that a tank used to store liquid sugar for manufacturing a carbonated beverage was used indirectly rather than directly in the manufacturing process and was not exempt from the Georgia tax. We conclude that the storage tanks and their foundations were not directly used in manufacturing and are subject to tax, as the trial court ruled.

The remaining items in controversy are the cement, reinforcing steel, rods, and wires used in construction of the plant floor. Webster says that the floor is actually a trackage system in which the concrete separates the tracks and protects the hoists that pull carts of bricks from one part of the manufacturing plant to another, so that the floor is useful only so long as the machinery remains in place. The automated control system is undoubtedly essential to the manufacturing process used by Webster in this plant. But the floor supports the weight of the building, as well as the weight of the cars and tracks, and serves as a base for the automatic hydraulic equipment, electronically activated, buried under the concrete. Although it is used indirectly in the manufacturing process to expedite the work and to facilitate the movement of material and work product, the floor is not used directly in manufacturing. Therefore, we hold that the trial court correctly ruled that the cement, reinforcing steel, rods, and wires were not entitled to exemption from the tax.

For the reasons assigned, we hold that the taxpayer is not entitled to exemption from the taxes assessed against it. Accordingly, the judgment of the trial court will be affirmed.

*Affirmed.*