## CIRCUIT COURT OF THE CITY OF RICHMOND

B. I. Chemicals, Inc.

v.

Virginia Department of Taxation

September 30, 1994

Case No. LW-111-1

BY JUDGE MELVIN R. HUGHES, JR.

In this case B. I. Chemicals, Inc., has filed an Application for Correction of Erroneous Assessments against the Virginia Department of Taxation. It seeks a refund of certain sales and use taxes on the grounds that chemical additives used in its manufacturing processes are exempt. Virginia law allows an exemption when a manufacturer such as B. I. Chemicals can establish that products, materials have a "direct use" in the manufacturing process under § 58.1-608(A)(3)(b)(iii). Another basis for exemption applies when the products, materials used "either enter into . . . or become a component part of the finished product" under § 58.1-608(A)(3)(b)(i). Before the Court for decision are the parties' cross motions for summary judgment on stipulated facts. To put the motions in context it is necessary to summarize the proceedings and to describe in some detail B. I. Chemical's manufacturing process.

B. I. Chemicals is a Delaware corporation licensed to do business in Virginia with offices in Petersburg. It is engaged in the business of manufacturing bulk pharmaceutical chemical products for individual use. The Virginia Department of Taxation (the Department) levied two tax assessments in the amount of $13,456.46 on May 11, 1989, as a result of a sales and use tax audit conducted for the period of March, 1986 through February, 1989. B. I. Chemicals paid the full amount assessed against it and simultaneously filed a protective claim for refund. The Department denied

the protective claim, and B. I. Chemicals filed this application for correction of erroneous assessments.

B. I. Chemicals manufactures approximately fifty different pharmaceutical products. Generally, each process involves the mixing of various chemical ingredients and the application or removal of heat to achieve and maintain a specific temperature for specific amounts of time. The chemical ingredients required for a single process are mixed inside a sealed container known as a chemical reactor vessel.

Temperature levels in each reactor vessel are controlled by the contents of a jacket which surrounds the reactor vessel. In order to elevate the temperature level within the reactor vessel, hot water or steam may be pumped into its jacket. In order to reduce the temperature level within the reactor vessels, a "cooling mixture" may also be pumped into its jacket. The cooling mixture consists entirely of water and certain additives. The additives are biocides (a bromo chloro biocide for bacteria and algae and a blend of isothiazolins for broad spectrum bacteria control), defoamer (a substituted polysiloxane), and a corrosion inhibitor (a blend of zinc chloride and several organic compounds). These additives retard the buildup of contaminants which can compromise the cooling process.

The cooling mixture continually circulates through a "cooling system" composed of the jackets, connecting piping systems, and a water cooling tower. Heat is transferred from a reactor vessel through its walls into the cooling mixture contained in its jacket. The cooling mixture flows out of the jacket through pipes to the cooling tower where heat is released before the mixture continues to circulate through the cooling system.

All of the reactor vessels and jackets are housed in a single building. The cooling tower is outside adjacent to the building. The tower connects to the piping which leads to and away from the jackets. The temperature of the cooling mixture is reduced when the mixture flows over exposed plates in the open air in the tower. During this process a portion of the water in the cooling mixture evaporates as it encounters a counter current flow of air, releasing heat. When this occurs, the additives are also depleted. Both water and additives are replaced at the base of the water cooling tower as the cooling mixture re-enters the circulation pipes.

Without the proper balance of components within the cooling mixture, the cooling mixture becomes contaminated by the formation of algae, bacteria, foam, and scale as it circulates through the cooling system. The impurities and contaminants flow as suspended solids in the cooling mixture and attach themselves to the inside walls of the jackets, pipes, and to

the exterior walls of the reactor vessels. These contaminants reduce the ability of the cooling mixture to transfer heat away from the reactor vessels. They can also impede the free flow of the cooling mixture through the cooling system and thereby slow the cooling process. A buildup of these contaminants can shut down the whole system within twenty-four hours. The manufacturing process cannot operate without additives to the water to make a cooling mixture.

The cooling system, including the water tower, operates twenty-four hours a day, seven days a week. For one week each year, B. I. Chemicals shuts down its entire production system for general and routine maintenance and overhaul of the various equipment and machinery. Any scale, algae, and bacteria which might have formed in the cooling system in spite of the use of the additives are cleaned out at this time. B. I. Chemicals and the Department agree that the cooling system is an "integral part" of the bulk pharmaceutical chemical production process.

The issue presented is whether the purchase and use of the additives necessary for the cooling system are exempt from Virginia sales and use taxes. Virginia Code § 58.1-608(A)(3)(b)(i)[1] states in pertinent part:

> [t]he tax imposed by this chapter . . . shall not apply to the following . . . . (b)(i) Industrial materials for future processing, manufacturing, refining, or conversion into articles of tangible personal property for resale where such industrial materials either enter into the production or become a component part of the finished product.

Virginia Code § 58.1-608(A)(3)(b)(iii)[2] allows the exemption for:

> supplies, used directly in processing, manufacturing, refining, mining, or conversion of products for sale or resale.

The parties agree that, if either of these two exemptions applies, B. I. Chemicals will be entitled to a refund of taxes and interest.

The following principles govern the decision in the case. Tax assessments made by the proper authorities are prima facie correct and the burden is on the taxpayer to show that such an assessment is erroneous. *Commonwealth v. Radiator Corp.*, 202 Va. 13, 18, 116 S.E.2d 44, 47 (1960). Exemptions granted under the sales and use tax statutes are to be

---

[1] Now codified at Virginia Code § 58.1-609.3(2)(i).

[2] Now codified at Virginia Code § 58.1-609.3(2)(iii).

strictly construed against the taxpayer, with doubts resolved against the taxpayer. *Webster Brick Co. v. Department of Taxation*, 219 Va. 81, 84, 245 S.E.2d 252, 255 (1978); *see also* Va. Const., Art. X, sec. 6(f) (1971); *Winchester TV Cable v. State Tax Commissioner*, 216 Va. 286, 289-90, 217 S.E.2d 885, 889 (1975). The construction of a statute by a state official charged with its administration is entitled to great weight, but the court is not bound by such construction if inconsistent with the applicable statute. *Commonwealth v. United Airlines, Inc.*, 219 Va. 374, 381-82, 248 S.E.2d 124, 128 (1978) (citing *Webster Brick*, 219 Va. at 84-85, 245 S.E.2d at 255).

First, we consider the "direct use" exemption. Both the Department and B. I. Chemicals recognize that whether the additives are "used directly" is a key issue in determining whether this exemption applies. "Used directly . . . refers to those activities which are an integral part of the production of a product, including all steps of an integrated manufacturing or mining process; but *not including ancillary activities such as general maintenance or administration.*" Virginia Code § 58.1-602 (emphasis added). While both the Department and B. I. Chemicals agree that the additives are essential to the manufacture of B. I.'s pharmaceuticals, use of the word "directly" implicates only "such essential tangible personal property used *immediately and principally.*" *Commonwealth v. Community Motor Bus Co.*, 214 Va. 155, 159, 198 S.E.2d 619, 622 (1973) (emphasis added). Thus, more than essentiality is required for the direct use exemption to apply.

The additives' main purpose is to prevent algae, bacteria, foam, and scale from building up inside the elements of the cooling system. While this is a constant, strictly regulated, twenty-four hours per day process, and while a cessation of this process would result in a rapid breach of the integrity of the production, this nevertheless is a process associated with maintenance. These additives are used no more directly than the chemicals and tools used during the one week shutdown of the plant, when the entire system is thoroughly cleaned. Any materials used during either of these *maintenance processes were clearly not contemplated by the General Assembly* to be exempt under this provision, given the statutory definition of "used directly." Virginia Code § 58.1-608(A)(3)(b)(iii), therefore, does not apply.

Next, the "enter into or . . . component part" exemption under § 58.1-608(A)(3)(b)(i). There is no question that the additives do not become a

component part of any finished product. The inquiry must, therefore, focus on the "enter into" portion of the statute. There is very little discussion in Virginia case law as to when something "enters into the production of" a finished product. Va. Code § 58.1-602 defines "manufacturing, processing, refining or conversion" to include:

> the production line of the plant starting with the handling and storage of raw materials at the plant site and continuing through the last step of production where the product is finished or completed for sale and conveyed to a warehouse at the production site, and also includes equipment and supplies used for production line testing and quality control.

Exhibit C attached to the Stipulation of Facts contains the letter from the tax commissioner informing B. I. Chemicals of the Department's ruling. The letter does not mention the "enter into production" exemption. Attached to the letter is an October 1985 ruling as support for the finding. In that case, the Department ruled that water treatment chemicals designed to remove inhibiting minerals from a boiler were not exempt because they were not used directly. After determining that they were not used directly, the Commissioner summarily stated:

> [t]he chemicals do not enter into the refining process stream; rather, they remove undesirable ingredients from water to prevent corrosion of items used directly in the refining process. As such, the chemicals serve a general maintenance function.

This does not fully analyze the "enter into the production" exemption. In its argument and on brief in this proceeding, the Department seems to base its determination that no exemption applies on the "direct use" issue and gives scant analysis to the question of whether the additives "enter into the production."

As B. I. Chemicals suggests, the Department relies heavily on the fact that the additives do not mix with the actual product chemicals. See Exhibit C, notice of department ruling, at 2. The statute states that materials which "*either* enter into the production of or become a component part of the finished product" will be exempt. Virginia Code § 58.1-608(A)(3)(b)(i) (emphasis added). Mixing would implicate the "component part" portion of the statute and make the exemption apply on that basis. The additives do not have to mix in order for the "enter into the production" exemption to apply.

There are however, some sources outside Virginia law which contradict this proposition. Am. Jur. states:

> To be exempt from sales and use taxes under statutes exempting the purchase of tangible personal property which enters into the processing of or becomes an ingredient or component part of the product or service, tangible personal property purchased by a manufacturer and which enters into the processing of the manufactured product, must become a constituent part thereof, wholly or partially, by either chemical or mechanical means.

68 Am. Jur. 2d, *Sales and Use Tax*, § 147 (1993) (citing *Western Electric Co. v. Weed*, 524 P.2d 1369 (Ill. 1974)). In *Western Electric*, the statute in question exempted personal property which "enters into the processing of or becomes an ingredient or component part of the product." *Western Electric*, 524 P.2d at 1371. The court ruled that the property in question must become a constituent part of the finished product in order for the exemption to apply. *Id.* 1373. Thus, there is authority that supports what apparently is the Department's view of what "enter into" means; namely, that this part of the exemption test is satisfied when a thing winds up as a part of the finished product.

However, in *State Bd. of Equalization v. Cheyenne Newspapers, Inc.*, 611 P.2d 805 (Wyo. 1980), the Wyoming Supreme Court construed a statute exempting "[t]angible personal property or product which directly enters into or becomes an ingredient or component part of any manufactured article." *Id.* at 807. The Wyoming Court put great importance on the fact that the legislature uses the word "or" as opposed to "and." The court stated:

> The construction of the language "enters into" when separated from "becomes an ingredient or component part of any manufactured article" by the word "or" does not mean that the purchased property must in a physical sense enter into the purchaser's product. Rather, it means it must enter in an economic sense.

*Id.* at 809. This supports the idea that the similar Virginia statute places two different standards for this exemption, "enter into" on one hand and "component part" on the other.

As noted, the word "either" precedes "enter into . . . or becomes a component part of . . . ." in our statute. The Am. Jur. analysis and the

Illinois Supreme Court do not consider the use of the word "either." I believe that "or" indicates both conditions do not have to be satisfied. The word "either" creates a clear choice if "or" is not strong enough to do so. If the General Assembly wanted the exemption of property entering into the production to be conditioned on whether they were component parts of the finished product, use of both phrases would be surplusage. On the other hand, the legislature may have intended to express one standard in two ways, an approach which best comports with the Department's argument.

The Department argues that the additives do not enter into the production of the pharmaceuticals. The Department, in its Memorandum states: "[a]t best, they prevent interference with the manufacturing process. They do not add any necessary ingredient or treatment, like cooling, to the process of manufacturing bulk pharmaceutical chemical products." Defendants' Memorandum in Support of its Motion for Summary Judgment, p. 10. The Court cannot agree with this statement in its entirety. From what has been described the additives are necessary for cooling in the production. Since production starts with the handling of raw materials, at the point the additives are used, production has begun. I fail to see how something cannot enter into the production of something and yet cause production to cease if it is not present, since the manufacturing facilities cannot be operated with a cooling mixture composed only of water.

When the authorities and the words of the statute are considered the "enter into" requirement for the exemption is open to two interpretations: one, that any product or item used to achieve the end product "enters into the production;" or two, any such item or thing must become a physical part of the finished product, to be exempt. It has been noted that any doubts must be construed against the taxpayer and that the Court must afford weight to that construction by the agency charged with enforcing it. In other words, since the "enter into" exemption can be interpreted to both allow and to deny the exemption, the claimed exemption under this standard is also denied. On this prong of the claimed exemption the Court concludes that the additives do not "enter into the production."

For the foregoing reasons, the Court concludes that B. I. Chemicals is not entitled to an exemption and, thus not entitled to a refund of the sales and use taxes imposed during the mentioned period.