COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, O'Brien and Malveaux
Argued at Richmond, Virginia


SUE KARR, HAROLD H. McCALL,
  JAMES R. WEBB AND CAROL ANN WHITE

                                                            OPINION BY
v.      Record No. 1715-15-2              JUDGE ROBERT J. HUMPHREYS
                                                         AUGUST 9, 2016
VIRGINIA DEPARTMENT OF
  ENVIRONMENTAL QUALITY AND
  DAVID K. PAYLOR, DIRECTOR


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Joi Jeter Taylor, Judge

Tammy L. Belinsky for appellants.

Matthew L. Gooch, Assistant Attorney General (Mark R. Herring,
Attorney General; John W. Daniel, II, Deputy Attorney General;
Lynne C. Rhode, Senior Assistant Attorney General, on brief), for
appellees.


        Appellants Sue Karr, Harold H. McCall, James R. Webb, and Carol Ann White

(collectively "appellants") appeal the September 30, 2015 decision of the Circuit Court of the

City of Richmond (the "circuit court") upholding the adoption of Permit(s) by Rule Regulation

for the Construction and Operation of Small Wind Energy Projects ("the Regulations") by the

Virginia Department of Environmental Quality ("DEQ" or "the Department") and approved by

the Director of DEQ, David K. Paylor ("DEQ Director Paylor"), pursuant to Code

§§ 10.1-1197.5-1197.11, Virginia Administrative Process Act (APA) Code §§ 2.2-4026-4027,

and Rule 2A:4 of the Rules of the Supreme Court of Virginia.  On cross-appeal, DEQ appeals the

circuit court's May 23, 2011 decision to overrule DEQ's plea in bar.

        The appellants assign six errors to the circuit court's September 30, 2015 decision.  The

appellants claim that it was error for the circuit court to find:  1) that DEQ complied with the

statutory authority given to it pursuant to Code § 10.1-1197.6 because the Regulations do not require the analysis of beneficial and adverse impacts of proposed wind energy projects of wildlife; 2) that DEQ lawfully predetermined significant adverse impacts to wildlife without requiring the collection of site-specific information as mandated by Code § 10.1-1197.6(B)(7); 3) that the term "wildlife" is ambiguous and that DEQ's interpretation of the term has special weight; 4) that DEQ complied with its statutory authority pursuant to Code § 10.1-1197.6 because the regulation "unsettles, disregards, alters, or violates the pre-existing system of statutory provisions for the regulation of impact(s) to threatened and endangered [referred to throughout the record as "T&E"] species[1]"; 5) that specialization or technical assistance offered by a Regulatory Advisory Panel ("RAP") justified non-compliance with statutory authority; and 6) that each party must bear its own costs. On cross-appeal, DEQ contends that this appeal was not timely filed consistent with the requirements of Rule 2A:2(a) of the Rules of the Supreme Court of Virginia because the law in effect at the time was that a regulation is finally adopted for the purposes of appeal at the time the Director of DEQ signed the Regulations and not at the time the Regulations were published in the Register of Regulations.

## I. BACKGROUND

In 2009, the General Assembly enacted Code §§ 10.1-1197.5 through -1197.11 granting new authority to DEQ to

> develop, by regulations . . . a permit by rule or permits by rule if it is determined by the Department that one or more such permits by rule are necessary for the construction and operation of small

---

[1] The circuit court did not rule on the appellants' argument that the Regulations create a conflict with preexisting statutory authority to regulate, as criminal in nature, any action that causes harm to state T&E species.

renewable energy projects, including such conditions and standards necessary to protect the Commonwealth's natural resources. [2]

Code § 10.1-1197.6(A).

Most relevant in the case at bar, DEQ was required to initially "develop the permit by rule for wind energy, which shall be effective as soon as practicable, but not later than January 1, 2011."[3] Id.

On October 22, 2010, DEQ Director Paylor signed the Regulations establishing the Permit by Rule ("PBR") for wind energy. On November 22, 2010, the Regulations were published in the Register of Regulations, with an effective date of December 22, 2010. 27 Va. Reg. Regs. 640 (Nov. 22, 2010). On December 22, 2010, the appellants filed their notice of appeal with DEQ. On January 21, 2011, the appellants filed their petition of appeal with the circuit court. On February 17, 2011, DEQ filed a plea in bar with the circuit court for lack of jurisdiction arguing that the appellants failed to comply with the timely filing requirements of Rule 2A:2(a) of the Rules of the Supreme Court of Virginia.[4] On May 23, 2011, the circuit court found "that the petition [sic] was filed within 30 days of publication of regulation" and it overruled DEQ's plea in bar.

---

[2] In pertinent part, Code § 10.1-1197.5 defines a "small renewable energy project" as "an electrical generation facility with a rated capacity not exceeding 100 megawatts that generates electricity only from sunlight, wind, falling water, wave motion, tides, or geothermal power." "Small renewable energy project" is the only "term" defined by the General Assembly in Code §§ 10.1-1197.5-1197.11.

[3] The appellants challenge the Regulations as applied to all small wind energy projects throughout the Commonwealth, yet are most aggrieved by the proposed wind turbine development site on Poor Mountain in Roanoke County.

[4] In 2011, Rule 2A:2(a) stated "[a]ny party appealing from a regulation or case decision shall file, within 30 days after adoption of the regulation or after service of the final order in the case decision, a notice of appeal signed by the appealing party or that party's counsel."

Over four years later, on September 30, 2015, the circuit court issued its final decision on the merits in favor of DEQ. The circuit court found:

> [T]he General Assembly expressly conferred authority to DEQ to determine what constitutes a significant adverse impact to "wildlife" and in doing so, they did not define the term "wildlife." The term wildlife, without more, can be read in more than one way and is neither clear nor definite in and of itself. As such, the term wildlife is ambiguous and is subject to interpretation by the agency charged with enforcing the statute.

In its ruling, the circuit court also found that: 1) DEQ complied with the statutory authority given to it pursuant to Code § 10.1-1197.6; 2) because the term "wildlife" was ambiguous, DEQ's interpretation of wildlife was to be given special weight; 3) DEQ used its discretion appropriately and reasonably in its interpretation of the term "wildlife" as used in Code § 10.1-1197.6(B)(7); and 4) DEQ used its discretion appropriately and reasonably in determining the appropriate triggers for the creation of mitigation plans.

## II. ANALYSIS

### A. Standard of Review

"A question of statutory interpretation is subject to review *de novo* on appeal." Bennett v. Commonwealth, 60 Va. App. 656, 665, 731 S.E.2d 40, 44 (2012).

### B. DEQ's Cross-Appeal: Denial of Plea in Bar

We first address DEQ's cross-appeal regarding the circuit court's May 23, 2011 decision overruling DEQ's plea in bar. DEQ maintains that the circuit court erred in overruling the plea in bar based on a failure of the appellants to comply with the 30-day notice requirement of Rule 2A:2(a).

The circuit court found the appellants' notice of appeal to the Department timely, thus, it decided that it had jurisdiction over the case. A timely-filed notice of appeal is necessary to confer jurisdiction upon the court to hear the appeal. Bd. of Supervisors v. Bd. of Zoning

Appeals, 271 Va. 336, 346, 626 S.E.2d 374, 380 (2009). Under Virginia law, if the circuit court was without jurisdiction, then it was error to address the appellants' challenges to the regulation. See Russell v. Va. Bd. of Agric. & Consumer Servs., 59 Va. App. 86, 95, 717 S.E.2d 413, 417 (2011).

This is an action appealing a regulation adopted by DEQ; as such, it is governed by the APA. Pursuant to the APA, "[a]ny person affected by and claiming the unlawfulness of any regulation . . . shall have a right to the direct review thereof by an appropriate and timely court action against the agency or its officers or agents in the manner provided by the Rules of Supreme Court of Virginia." Code § 2.2-4026(A). At the time the Regulations were promulgated, Rule 2A:2(a) required that "[a]ny party appealing from a regulation or case decision shall file, within 30 days after *adoption* of the regulation or after service of the final order in the case decision, a notice of appeal signed by the appealing party or that party's counsel." (Emphasis added). The issue presented by DEQ's cross-appeal is identical to the issue this Court addressed in Russell: "when the point of 'adoption' occurs when an agency creates a regulation such as to trigger the beginning of the 30-day period in which to note an appeal." Russell, 59 Va. App. at 91, 717 S.E.2d at 415.

After DEQ promulgated the Regulations in question and the Russell opinion was issued, the Rules of the Supreme Court of Virginia and the Code of Virginia were amended to clarify when the point of adoption occurs, thus creating the triggering event which begins the 30-day period to note an appeal. In July 2014, Rule 2A:2(a) was amended to clarify the term "adoption," by adding "[w]ith respect to an appeal from a regulation, the date of adoption or readoption shall be the date of publication in the Register of Regulations." Additionally, in 2014 the General Assembly amended Code § 2.2-4026 and added subsection B which states:

- 5 -

[n]otwithstanding any other provision of law or of any executive order issued under this chapter, with respect to any challenge of a regulation subject to judicial review under this chapter, the date of adoption or readoption of the regulation pursuant to § 2.2-4015 for purposes of appeal under the Rules of Supreme Court shall be the date of publication in the Register of Regulations.

Code § 2.2-4026(B).

The 2014 modifications to the Rules and the Code clearly establish the date of adoption to be the date of its publication in the Register of Regulations. However, those modifications do not retroactively determine when the point of "adoption" occurred prior to their implementation. Thus, we must revisit the same issue discussed at length, but never decided, in Russell.

In Russell, this Court extensively discussed that the "problem with determining the date of adoption for the purpose of Rule 2A:2 is that the APA uses the term 'adoption' at several different points and in different contexts." 59 Va. App. at 91, 717 S.E.2d at 415. This Court cannot be any clearer in its analysis than it was in Russell:

> Code § 2.2-4013 is the statute which is relevant to this analysis, and it references "adoption" in three different ways. Under subsection A, "adoption" first occurs when the agency decides to adopt a regulation following public comment. The statute specifically says,
>
> > "Not less than fifteen days following the completion of the public comment period provided for in § 2.2-4007.03, the agency may (i) *adopt* the proposed regulation if the Governor has no objection to the regulation; (ii) modify and *adopt* the proposed regulation after considering and incorporating the Governor's objections or suggestions, if any; or (iii) *adopt* the regulation without changes despite the Governor's recommendations for change."
>
> Code § 2.2-4013(A) (emphasis added).
>
> The next subsection then references a point of "final adoption" by the agency that relates back to the initial adoption. This subsection states that,

"Upon *final adoption* of the regulation, the agency shall forward a copy of the regulation to the Registrar of Regulations for publication as soon as practicable in the Register. All changes to the proposed regulation shall be highlighted in the final regulation, and substantial changes to the proposed regulation shall be explained in the final regulation."

Code § 2.2-4013(B) (emphasis added). Although this subsection of the statute characterizes this action by the agency as the "final adoption" of a regulation, in yet another subsection, the Code requires a "thirty-day final adoption period." This arguably implies that the "final adoption" referred to in Code § 2.2-4013(B) is not actually "final" at all until the conclusion of the 30-day period. Specifically, the Code states,

"A *thirty-day final adoption period* for regulations shall commence upon the publication of the final regulation in the Register. The Governor may review the final regulation during this *thirty-day final adoption period* and if he objects to any portion or all of a regulation, the Governor may file a formal objection to the regulation, suspend the effective date of the regulation in accordance with subsection B of § 2.2-4014, or both. If the Governor files a formal objection to the regulation, he shall forward his objections to the Registrar and agency prior to the conclusion of the *thirty-day final adoption period*. The Governor shall be deemed to have acquiesced to a promulgated regulation if he fails to object to it or if he fails to suspend the effective date of the regulation in accordance with subsection B of § 2.2-4014 during the *thirty-day final adoption period*. The Governor's objection, or the suspension of the regulation, or both if applicable, shall be published in the Register. A regulation shall become effective as provided in § 2.2-4015."

Code § 2.2-4013(D) (emphasis added). This "final adoption" occurs thirty days after the publication of the final regulation in the Register, whereas the "final adoption" in subsection B is the agency action that triggers the publication of the final regulation in the Register in the first place. Thus, logic dictates that the "final adoption" referred to in subsection D must be separate and distinct from the "final adoption" in subsection B.

Id. at 91-92, 717 S.E.2d at 415-16.

In Russell, this Court posed the question "does 'final adoption' of a regulation occur when the agency votes to implement it and forwards the regulation to the Registrar of

- 7 -

Regulations for publication or after the expiration of the 30-day public comment period during which the Governor can suspend or suggest changes to the regulation?" Id. at 93, 717 S.E.2d at 416. Ultimately, this Court resolved Russell by "assuming without deciding that the regulation is 'finally adopted' as contemplated by Code § 2.2-4013(D) which occurs at the conclusion of the 30-day 'final adoption period,'" because the "application of either definition of 'adoption' to the record before us results in a conclusion that Russell's appeal was not timely filed." Id. The Attorney General argues on behalf of DEQ that the statute in effect at the time provided that adoption of a regulation occurred when the Director signed it rather than when the public received notice through publication. However, dicta in Russell explained that

> [p]rocedural due process considerations and the principle that appellate courts may generally only consider issues on appeal which involve lower court judgments, or as in this case, agency decisions which are final, weigh in favor of using the later date as the point at which the period for noting an appeal commences.

Id. These same due process considerations support our rejection of the Attorney General's argument since to accept it would mean that the 30-day time to appeal would begin running before any interested or aggrieved party had any constructive notice of the existence of the regulation.

Next, this Court explained how to calculate the later 'finally adopted' date as contemplated by Code § 2.2-4013(D). In Russell, the Virginia Board of Agriculture and Consumer Services published the final regulation in the August 18, 2008 issue of the Register of Regulations. Id. at 89-90, 717 S.E.2d at 414-15. This triggered the 30-day final adoption period as required by Code § 2.2-4013(D), and the regulation was "adopted" and became effective on September 17, 2008.

> This is the latest date on which the regulation could be "finally adopted." Thus, if the 30-day notice period in Rule 2A:2 started at this point, anyone aggrieved by action of the agency in adopting

> the regulation must have filed a notice of appeal by October 17, 2008. In this case, the notice of appeal was not filed until October 30, 2008; therefore, the notice of appeal was untimely.

Id. at 93, 717 S.E.2d at 416. Similar to the facts of Russell, which did not present this Court with the opportunity to provide a definitive answer regarding the meaning of "adoption" as used in the APA prior to 2014, the case at bar also does not provide the opportunity to address the precise issue.

As already noted, DEQ argues that the Director's signature date on a regulation is the date of adoption. Meanwhile, appellants argue that the date of adoption is the date of publication in the Register of Regulations, which is the date adopted by the 2014 amendments. The circuit court found that the October 22, 2010 date of adoption by DEQ Director Paylor's signature was "only the first step in preparing a regulation which has the force and effect of law." The circuit court gave a further explanation:

> The Director's adoption could not have the force of law and affect anyone until it had been reviewed by the Governor and the Attorney General and filed with the Registrar of Regulations. See Code §§2.2-4012(B), 2.2-4013 and 2.2-4015. Prior to this it cannot be a "regulation." Further, prior to a regulation becoming effective, there could be no person with standing to file a petition as his interests could not be affected by the regulation. Under that circumstance the court would be called on for an advisory opinion.

DEQ asserts that the circuit court erred in its reasoning because this Court, in Russell, rejected the interpretation that the date of adoption was equivalent to the effective date of the regulation, the point at which it would have the force of law.

We disagree with DEQ that the date of adoption triggering the 30-day period to note an appeal is the date that the director or Board signs a regulation. Neither definition considered in Russell adopted such a view. Rather, the two definitions explained in Russell contemplated the triggering event to be when a regulation is published in the Register of Regulations or thirty days

after the Governor reviewed the regulations once the regulations were published in the Register of Regulations. 59 Va. App. at 91-92, 717 S.E.2d at 415-16. Under either definition, the appellants timely noted an appeal with DEQ.

DEQ Director Paylor signed the Regulations on October 22, 2010. On November 22, 2010, the Regulations were published in Register of Regulations with an effective date of December 22, 2010. On December 22, 2010, appellants filed their notice of appeal with DEQ. On May 23, 2011, the circuit court found "that the petition [sic] was filed within 30 days of publication of regulation." The circuit court was correct as the notification of appeal was filed on December 22, 2010, which was thirty days after November 22, 2010, the date the Regulations were published in Register of Regulations. Therefore, the appellants properly noted their appeal under the first definition of "final adoption" as contemplated in Russell.

The appellants also timely noted their appeal under the second definition contemplated in Russell.[5] Under the second definition, DEQ published the final Regulations in the November 22, 2010 issue of the Register of Regulations. This triggered the 30-day final adoption period as required by Code § 2.2-4013(D), and the Regulations were "adopted" and became effective on December 22, 2010. This is the latest date on which the Regulations could be "finally adopted." Thus, if the 30-day notice period in Rule 2A:2(a) started at this point, anyone aggrieved by an action of the Department in adopting the Regulations must have filed a notice of appeal by January 21, 2011. In this case, the notice of appeal was filed on December 22, 2010; therefore, the notice of appeal was timely under either definition contemplated in Russell. Thus, we affirm the circuit court's decision overruling DEQ's plea in bar.

---

[5] The latter definition discussed in Russell was not adopted by the General Assembly in the 2014 amendments.

C.  Preservation of Appellants' Assignments of Error:  Rule 2A:4(b)

Rule 2A:4(b) clearly states that "[t]he petition for appeal shall designate the regulation or case decision appealed from, specify the errors assigned, state the reasons why the regulation or case decision is deemed to be unlawful and conclude with a specific statement of the relief requested."  "Generally, rules governing appeal procedures are mandatory and 'compliance with them is necessary for the orderly, fair and expeditious administration of justice.'"  Mayo v. Dep't of Commerce, 4 Va. App. 520, 522, 358 S.E.2d 759, 761 (1987).  Additionally, "[a] basic principle of appellate review is that, with few exceptions . . . arguments made for the first time on appeal will not be considered."  Martin v. Ziherl, 269 Va. 35, 39, 607 S.E.2d 367, 368 (2005).  "[A]n appellate court's review of the case is limited to the record on appeal."  Wilkins v. Commonwealth, 64 Va. App. 711, 717, 771 S.E.2d 705, 708 (2015).

The appellants did not include the following two assignments of error in their petition for appeal:  1) whether the circuit court erred in finding that DEQ complied with its statutory authority pursuant to Code § 10.1-1197.6 because the regulation "unsettles, disregards, alters, or violates the pre-existing system of statutory provisions for the regulation of impact(s) to T&E species"; and 2) whether the circuit court erred in finding that specialization or technical assistance offered by a RAP justified non-compliance with statutory authority.  Because these two assignments of error were not preserved in the appellants' petition for appeal, we decline to reach the merits of either assignment of error.  See Rule 2A:4(b).

There are four remaining issues that were included in the petition for appeal and are properly before this Court for adjudication:  1) whether the circuit court erred in determining that DEQ complied with the statutory authority given it pursuant to Code § 10.1-1197.6; 2) whether the circuit court erred in finding that DEQ lawfully predetermined significant adverse impacts to wildlife without requiring the collection of site-specific information as mandated by Code

- 11 -

§ 10.1-1197.6(B)(7); 3) whether the circuit court erred in finding that the term "wildlife" is ambiguous and that DEQ's interpretation of the term has special weight; and 4) whether the circuit court erred by finding each party must bear its own costs.

### D.  Ambiguity of "Wildlife" in Code § 10.1-1197.6

In order to resolve the appellants' first two assignments of error, it is necessary to first address the appellants' third assignment of error faulting the circuit court for finding "wildlife" to be an ambiguous term and, therefore, allowing DEQ's interpretation of "wildlife" to be given special weight.  The circuit court stated:

> [I]t is clear that the General Assembly expressly conferred authority to DEQ to determine what constitutes a significant adverse impact to wildlife and in doing so, they did not define the term "wildlife."  The term wildlife, without more, can be read in more than one way and is neither clear nor definite in and of itself.  As such, the term wildlife is ambiguous and is subject to interpretation by the agency charged with enforcing the statute.

Additionally, the circuit court found "that DEQ used its discretion appropriately and reasonably in its interpretation of the term 'wildlife' as used in Code § 10.1-1197.6(B)(7) and in its determination of the appropriate triggers for the creation of mitigation plans."

Code § 10.1-1197.6(B) requires that the conditions for issuance of the PBR for small renewable energy projects include various studies and impact statements.  At issue in this case are subsections 7 and 8:

> 7. Where relevant, an analysis of the beneficial and adverse impacts of the proposed project on natural resources.  For wildlife, that analysis shall be based on information on the presence, activity, and migratory behavior of wildlife to be collected at the site for a period of time dictated by the site conditions and biology of the wildlife being studied, not exceeding 12 months;
>
> 8.  If the Department determines that the information collected pursuant to subdivision B 7 indicates that significant adverse impacts to wildlife or historic resources are likely, the submission of a mitigation plan detailing reasonable actions to be taken by the

owner or operator to avoid, minimize, or otherwise mitigate such
impacts, and to measure the efficacy of those actions.

Code § 10.1-1197.6(B)(7)-(8). Because the General Assembly did not speak to the particulars of

the wildlife study, we must determine if "wildlife" is an ambiguous term.

"Words in a statute are to be construed according to their ordinary meaning, given the

context in which they are used." Women's Healthcare Assocs. v. Mucci, 64 Va. App. 420, 435,

768 S.E.2d 720, 728 (2015). "Where the legislature has used words of a plain and definite

import the courts cannot put upon them a construction which amounts to holding the legislature

did not mean what it has actually expressed." Watkins v. Hall, 161 Va. 924, 930, 172 S.E. 445,

447 (1934). "When the language of a statute is unambiguous, we are bound by the plain

meaning of that language. Furthermore, we must give effect to the legislature's intention as

expressed by the language used unless a literal interpretation of the language would result in a

manifest absurdity." Va. Dep't of Corr. v. Surovell, 290 Va. 255, 268, 776 S.E.2d 579, 586

(2015). In order "[t]o determine whether language is ambiguous, we must consider whether the

text can be understood in more than one way or refers to two or more things simultaneously or

whether the language is difficult to comprehend, is of doubtful import, or lacks clearness or

definiteness." Blake v. Commonwealth, 288 Va. 375, 381, 764 S.E.2d 105, 107 (2014) (citation

and internal quotation marks omitted).

In Regulation 9 VAC 15-40-10, DEQ defined "wildlife" as "wild animals; except

however, that T&E insect species shall only be addressed as part of natural heritage resources

and shall not be considered T&E wildlife." A standard dictionary defines "wildlife" as "living

things that are neither human nor domesticated; the mammals, birds, and fishes that are hunted

by man for sport or food." Webster's Third New International Dictionary 2616 (3d ed. 1993).

Additionally, the term "wildlife" is defined with the authorities granted to the Department of

- 13 -

Game and Inland Fisheries ("DGIF") in another section of the Code as "all species of wild animals, wild birds, and freshwater fish in the public waters of this Commonwealth." Code § 29.1-100. We conclude that the term "wildlife" is not difficult to comprehend or unclear and that it must be construed as to its ordinary meaning. The term "wildlife" is unambiguous, and the plain language of the statute controls. Therefore, we hold that the circuit court erred in finding the term "wildlife" in Code § 10.1-1197.6 to be ambiguous; subsequently, the circuit court further erred in finding that DEQ's interpretation was to be given special weight.

In Nielsen Co. (US), LLC v. Cty. Bd. of Arlington Cty., 289 Va. 79, 88, 767 S.E.2d 1, 4-5 (2015), the Supreme Court of Virginia provided guidance on a court's deference to administrative agencies when interpreting statutes, and the weight a court affords an administrative agency's interpretation of an unambiguous statute:

> [C]ourts do not defer to an agency's construction of a statute because the interpretation of statutory language always falls within a court's judicial expertise. Virginia Marine Res. Comm'n v. Chincoteague Inn, 287 Va. 371, 380, 757 S.E.2d 1, 5 (2014). Though a court never defers to an administrative interpretation, in certain situations a court may afford greater weight than normal to an agency's position. When "the statute is obscure or its meaning doubtful, [a court] will give great weight to and sometimes follow the interpretation which those whose duty it has been to administer it have placed upon it." Superior Steel Corp. v. Commonwealth, 147 Va. 202, 206, 136 S.E. 666, 667 (1927). But even when great weight is afforded to an administrative interpretation of a statute, such an interpretation does not bind a court in deciding the statutory issue. Webster Brick Co. v. Department of Taxation, 219 Va. 81, 84-85, 245 S.E.2d 252, 255 & n.4 (1978). In any event, absent ambiguity, the plain language controls and the agency's interpretation is afforded no weight beyond that of a typical litigant. See Davenport v. Little-Bowser, 269 Va. 546, 555, 611 S.E.2d 366, 371 (2005).

Due to the lack of ambiguity, the plain language controls. We conclude that "wildlife" as used in Code § 10.1-1197.6 means all living things that are neither human nor domesticated; the mammals, birds, and fishes that are hunted by man for sport or food. Thus, the circuit court

- 14 -

erred in concluding otherwise. However, that does not end our analysis with respect to the circuit court's ultimate holding.

### E. DEQ Compliance with Code § 10.1-1197.6(B)(7)

The appellants assert that because the circuit court erred in concluding that the term "wildlife" was ambiguous, it also erred in its judgment that the Regulations complied with Code § 10.1-1197.6(B)(7). The statute requires that the conditions for issuance of the PBR for small renewable energy projects shall include:

> *Where relevant*, an analysis of the beneficial and adverse impacts of the proposed project on natural resources. For wildlife, that analysis shall be based on information on the presence, activity, and migratory behavior of wildlife to be collected at the site for a period of time dictated by the site conditions and biology of the wildlife being studied, not exceeding 12 months[.]

Code § 10.1-1197.6(B)(7) (emphasis added). Specifically, the appellants find issue with Regulation 9 VAC 15-40-40(A) because it "impermissibly requires actual real-time surveys only for certain species: bats, raptors, and coastal avian species."[6] The appellants insist that the plain

---

[6] Regulation 9 VAC 15-40-40(A) implements Code § 10.1-1197.6(B)(7). The Regulation states that "[t]he [permit] applicant shall conduct pre-construction wildlife analyses." Next, the Regulation lists seven surveys that shall be conducted and included in a wildlife report. 9 VAC 15-40-40(A)(1)-(7). In subdivision (A)(8) of the Regulation, "[t]he applicant shall provide to [DEQ] a report summarizing the relevant findings of the . . . surveys conducted pursuant to subdivisions 1 through 7 of this subsection." 9 VAC 15-40-40(A)(8).

Subdivisions (1), (4), and (6) are required for each applicant. Subdivision (1) requires the permit applicant to obtain a desktop survey that must contain a wildlife report and map generated from DGIF's data and mapping system of 1) known wildlife species and habitat features on the site, 2) known bat hibernacula on the site, 3) known maternity and bachelor bat colonies on the site, and 4) known or potential sea turtle nesting beaches located within one mile of the disturbance zone. 9 VAC 15-40-40(A)(1). Subdivision (4) requires the applicant to conduct one year of raptor migration surveys. Subdivision (6) requires the applicant to conduct bat acoustic surveys.

Subdivisions (2), (3), (5), and (7) of the Regulation require additional surveys only if the presence of a certain species was indicated in the mandatory desktop survey that was required in subdivision (1). Subdivision (2) requires the additional surveys of breeding birds if the desktop survey indicates the presence of or habitat for a state listed T&E bird species or a Tier 1 or Tier 2 bird Species of Greatest Conservation Need ("SGCN") to be conducted within the disturbance

- 15 -

meaning of Code § 10.1-1197.6(B)(7) requires real-time, site-specific studies of the presence, activity, and migratory behavior of wildlife collected on the site proposed for development conducted over a period of time not to exceed twelve months.

The Court must "look to the words of the statute to determine its meaning, and we consider the entire statute to 'place its terms in context.'" REVI, LLC v. Chi. Title Ins. Co., 290 Va. 203, 208, 776 S.E.2d 808, 810 (2015) (quoting Eberhardt v. Fairfax Cnty. Emps. Ret. Sys., 283 Va. 190, 194, 721 S.E.2d 524, 526 (2012)). "[I]t is our duty to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal." Id. (quoting VEPCO v. Board of Cnty. Supervisors, 226 Va. 382, 387-88, 309 S.E.2d 308, 311 (1983)). "Administrative rules and regulations 'may not conflict with the authorizing statute,' or in any material way be 'inconsistent with the authority of the statutes that govern it.'" Kavanaugh v. Va. Birth-Related Neurological Injury Comp. Program, 60 Va. App. 440, 447, 728 S.E.2d 527, 531 (2012) (citations omitted). When this Court reviews whether a regulation is inconsistent with its enabling legislation, it must "take into account the text as well as the context of the underlying statute, 'viewing it as a symmetrical and coherent regulatory scheme.'" Id. (quoting Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002)).

The appellants argue the phrase "to be collected at the site" means active data collection at the proposed development site. Moreover, they claim data collected at the site must include information about the "presence, activity, and migratory behavior of wildlife." Also, the

---

zone during the species' annual breeding season; Subdivision (3) requires a field survey of nonavian resources to be taken within the disturbance zone if the desktop survey indicates the presence of or habitat for a Tier 1 or Tier 2 vertebrate SGCN, other than birds, within the disturbance zone; Subdivision (5) requires additional field studies for avian resources in Coastal Avian Protection Zones ("CAPZ") with a different type of study required as determined by which CAPZ the proposed project is located; subdivision (7) requires the applicant to conduct a season appropriate mist-netting survey or harp-topping survey if the applicant identifies the potential for T&E bat species to occur within the disturbance zone. 9 VAC 15-40-40(A)(1)-(7).

appellants argue the period of time that the "presence, activity, and migratory behavior of wildlife" must be collected is dictated by the "site conditions and the biology of the wildlife being studied." The appellants further argue that the statute requires site-specific and active data collection including all wildlife not just the four wildlife species Regulation 9 VAC 15-40-40(A) includes. However, the appellants ignore the modifying clause of Code § 10.1-1197.6(B)(7) which says "[w]here relevant."

According to the appellants, "[u]nder straightforward principles of grammar, the word *relevant* does not modify the word *wildlife*." Rather, since relevant is in a separate sentence from wildlife, the word relevant only modifies "an analysis of beneficial and adverse impacts," and the next sentence in Code § 10.1-1197.6(B)(7) prescribes the information collection requirements in order to analyze the beneficial and adverse impacts on wildlife. We disagree with the appellants and hold that by using the phrase "where relevant," the General Assembly intended the study of wildlife required according to Code § 10.1-1197.6(B)(7) to be only of a subset of any wildlife likely to be impacted by the project as determined by the expertise of DEQ.

Code § 10.1-1197.6(B)(7) requires an analysis based "on the presence, activity, and migratory behavior of wildlife to be collected at the site for a period of time dictated by the site conditions and biology *of the wildlife being studied*, not exceeding 12 months." (Emphasis added). "The plain, obvious, and rational meaning of a statute is preferred over any curious, narrow, or strained construction." Commonwealth v. Zamani, 256 Va. 391, 395, 507 S.E.2d 608, 609 (1998). Furthermore, this Court is duty bound to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal. "[A] statute is not to be construed by singling out a particular phrase." Virginia Electric & Power Co. v. Citizens for Safe Power, 222 Va. 866, 869, 284 S.E.2d 613, 615 (1981). When viewing the statute in its entirety, it is evident the General Assembly only addresses the onsite study of *relevant* wildlife,

i.e., those species that DEQ identifies as sensitive to a project of this type. Thus, we hold that the circuit court did not err in concluding that DEQ complied with the statute which required an analysis based on the information on the presence, activity, and migratory behavior of wildlife DEQ found as relevant and sensitive to a small wind energy project.

### F. Whether DEQ Can Predetermine Significant Adverse Impacts

The appellants also challenge the circuit court's and DEQ's interpretation of Code § 10.1-1197.6(B)(8), arguing that the implementing Regulation 9 VAC 15-40-50(A) predetermines that the presence of only certain species of wildlife trigger a determination of significant impact and that the General Assembly did not intend for DEQ to first determine what species would be significantly impacted before requiring the collection of information for only a small subset of wildlife species.

Code § 10.1-1197.6(B)(8) requires that:

> If the Department determines that the information collected pursuant to subdivision B 7 indicates that significant adverse impacts to wildlife or historic resources are likely, the submission of a mitigation plan detailing reasonable actions to be taken by the owner or operator to avoid, minimize, or otherwise mitigate such impacts, and to measure the efficacy of those actions.

Read another way, Code § 10.1-1197.6(B)(8) requires the submission of a mitigation plan detailing reasonable actions to be taken by the applicant to avoid or minimize the significant adverse impacts to wildlife that DEQ determined likely to occur pursuant to the information collected pursuant to subdivision (B)(7).

DEQ implemented Code § 10.1-1197.6(B)(8) with Regulation 9 VAC 15-40-50. 9 VAC 15-40-50(A) is the challenged part of the Regulation and it states:

> A. The department shall find that significant adverse impacts to wildlife are likely whenever the wildlife analyses prescribed in 9 VAC 15-40-40(A) document that either of the following conditions exists:

- 18 -

1. Bats have been detected, or a hibernaculum exists, within the disturbance zone.
2. State-listed T&E wildlife are found to occur within the disturbance zone; or the disturbance zone is located on or within one mile of a known or potential sea turtle nesting beach.
3. Within the Coastal Avian Protection Zones, the applicant's field studies indicate that significant adverse impacts to avian resources are likely, or the applicant stipulates that existing scientific analysis, as reflected on the CAPZ map, supports a conclusion that significant adverse impacts to avian resources are likely.

In reading 9 VAC 15-40-50(A), DEQ would conclude that significant adverse impacts to wildlife are likely only when four conditions occur: 1) bats or a hibernaculum have been detected within the disturbance zone; 2) state listed T&E wildlife are found within the disturbance zone; 3) the disturbance zone is located on or within one mile of a known or potential sea turtle nesting beach; and 4) when field studies indicate that significant adverse impacts are likely to avian species within CAPZ.

"Administrative rules and regulations 'may not conflict with the authorizing statute,' or in any material way be 'inconsistent with the authority of the statutes that govern it.'" Kavanaugh, 60 Va. App. at 447, 728 S.E.2d at 531 (citations omitted). When this Court reviews whether a regulation is inconsistent with its enabling legislation, it must "take into account the text as well as the context of the underlying statute, 'viewing it as a symmetrical and coherent regulatory scheme.'" Id. (quoting Ragsdale, 535 U.S. at 86). The plain reading of Code § 10.1-1197.6(B)(8) empowers DEQ to determine if the information collected in the wildlife study performed pursuant to Code § 10.1-1197.6(B)(7) "indicates that significant adverse impacts to wildlife or historic resources are likely." Code § 10.1-1197.6(B)(8). Regulation 9 VAC 15-40-50(A) is the method created by DEQ for determining if the wildlife study conducted pursuant to Code § 10.1-1197.6(B)(7) indicates the likelihood of a significant adverse impact to

- 19 -

wildlife. Notably, the introductory phrase of Code § 10.1-1197.6(B)(8) states "[i]f the Department determines that the information collected pursuant to subdivision (B)(7)." Thus, we hold the statute expressly confers upon DEQ the authority to determine what constitutes a significant adverse impact to wildlife.

The text of 9 VAC 15-40-50(A) is clear; DEQ must find a likely significant adverse impact to wildlife if one of the three listed conditions is present within the project area. Based on the scientific data, DEQ created automatic mitigation for bats, T&E species, sea turtles, and avian species in CAPZ. 9 VAC 15-40-50(A). The General Assembly gave DEQ the power to determine which relevant wildlife will be significantly adversely impacted by the small wind energy project. Therefore, we affirm the circuit court's decision that DEQ acted properly in its determination of the appropriate triggers for the creation of mitigation plans pursuant to Code § 10.1-1197.6(B)(8).

## G. Attorney Fees and Costs

The appellants challenge the circuit court's decision that each party must bear its own attorney fees and costs. Pursuant to the APA,

> [i]n any civil case brought under Article 5 (§ 2.2-4025 et seq.) of this chapter or §§ 2.2-4002, 2.2-4006, 2.2-4011, or § 2.2-4018, in which any person contests any agency action, such person shall be entitled to recover from that agency, including the Department of Game and Inland Fisheries, reasonable costs and attorney fees if such person substantially prevails on the merits of the case and the agency's position is not substantially justified, unless special circumstances would make an award unjust. The award of attorney fees shall not exceed $ 25,000.

Code § 2.2-4030. The appellants did not prevail in the circuit court below or in this Court. Thus, pursuant to Code § 2.2-4030, the appellants are not entitled to attorney's fees as they did not substantially prevail on the merits of the case and the agency's position is substantially

justified. We, therefore, affirm the circuit court's decision that each party must bear its own costs.

## III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's May 23, 2011 decision to overrule DEQ's plea in bar as the appellants' notice for appeal was timely. On the merits, we hold that it was error for the circuit court to find the term "wildlife" as used in Code § 10.1-1197.6 to be ambiguous. Subsequently, it was also error, as a matter of law, for the circuit court to give DEQ's definition of the term "wildlife" greater weight. However, this error was harmless because the introductory phrase "where relevant" of Code § 10.1-1197.6(B)(7) directs DEQ to determine the relevant wildlife that will be impacted by the project. Additionally, DEQ had the subsequent authority under Code § 10.1-1197.6(B)(8) to determine what constitutes a significant adverse impact to wildlife. Accordingly, the circuit court did not err in finding DEQ used its discretion appropriately and reasonably in its interpretation of the term "wildlife" as used in Code § 10.1-1197.6(B)(7) and in its determination of the appropriate triggers for the creation of mitigation plans. Therefore, we affirm the judgment of the circuit court.

Affirmed.